UNITED STATED DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

FILED
IN OPEN COURT

MAY 2 9 2018

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Criminal No. 2:18cr69 |
| v. | ) |
| | ) |
| COURTNEY DETRON CLOMAN, | ) |
| | ) |
| Defendant. | ) |

### STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt:

### Background

1.      L&K Technology and Logistics (L&K) was a Virginia-based Limited Liability Company (LLC) based in Chesapeake, Virginia.

2.      COURTNEY DETRON CLOMAN is a naval flight officer in the United States Navy (USN).  CLOMAN, though not an official employee of L&K, received payment for his assistance with the establishment and operation of L&K.

3.      Associate 1 registered L&K on June 3, 2014, with the purported goal of filling government contracts for goods for the USN.

4.      CLOMAN alone established Wayne Tech and Inert (Wayne Tech) as a Florida-based profit-company in September 2015 with the same purported goal of contracting with the USN.

1



5.      CLOMAN does not dispute that the Government would prove that Conspirator 1 is an officer in the USN and was the supply liaison for a USN command based out of Virginia Beach, Virginia.

6.      CLOMAN does not dispute that the Government would prove that as the Supply liaison, Conspirator 1 had authority to make purchase requests for his unit.

7.      CLOMAN occasionally conducted business for L&K while holding himself out as "Dave Freese," an identity created by Conspirator 1.

8.      L&K maintained no inventory or warehouse, was not registered to do business with the Department of Defense, and had only one formal employee.  CLOMAN did not explicitly know that L&K held no inventory.

9.      CLOMAN registered Wayne Tech in September 2015 while he was attending USN flight school in Pensacola, Florida.

10.     CLOMAN also opened a business bank account for Wayne Tech at Navy Federal Credit Union (NFCU).

11.     Wayne Tech maintained no inventory or warehouse, and was not registered to do business with the Department of Defense.  CLOMAN was Wayne Tech's sole employee.

12.     CLOMAN does not dispute that the Government would prove that Contracting Firm V (Firm V) is located in San Diego, California and is a veteran owned, professional service firm that provides logistical support services to industry and government agencies.

13.     CLOMAN does not dispute that the Government would prove that Contracting Firm F (Firm F) is located in Virginia Beach, Virginia and provides tactical gear, uniforms, and security equipment to the USN and other government agencies.

14.     CLOMAN does not dispute that the Government would prove that John Doe is a sales representative of Firm F and personal acquaintance of Conspirator 1.

15.     CLOMAN does not dispute that at the time relevant to the Criminal Information, the Department of Defense (DOD) and the Defense Logistics Agency (DLA) used a goods-purchasing system known as Electronic Mall (E-Mall).

16.     CLOMAN does not dispute that the Government would prove that E-Mall was an internet based ordering platform meant to provide a full service e-commerce site to find and acquire finished goods and services from the commercial marketplace.

17.     CLOMAN does not dispute that the Government would prove that Firm V did business exclusively through E-Mall.

18.     Unbeknownst to CLOMAN, Conspirator 1 personally knew two Firm V sales representatives who regularly employed "product substitution" in their E-Mall sales to the USN through "Money Value Only" (MVO) sales orders.

19.     CLOMAN does not dispute that the Government would prove that the purpose of a MVO sales order is to create a credit balance on Firm V's books.

20.     CLOMAN does not dispute that the Government would prove that with a MVO, a military command would place a sales order request with Firm V for products available in Firm V's E-Mall "catalog." However, Firm V would then take the funds released for that sales order, and use them to purchase substitute products *not* available through E-Mall.

21.     CLOMAN does not dispute that the Government would prove that using a MVO, Firm V could provide a military unit with virtually any product needed, under the guise of a purchase for products in Firm V's approved E-Mall catalog.

**L&K Sales**

22.     CLOMAN does not dispute that the Government would prove that Firm V subcontracted business to L&K by virtue of Conspirator 1's personal connections with Firm V sales representatives.

23.     CLOMAN does not dispute that the Government would prove that for each subcontract provided to L&K, Firm V made purchases in E-Mall for substitute items totaling the same dollar value as the inert training aids actually requested by Conspirator 1 on behalf of his Navy unit.

24.     In or around May 2014, Conspirator 1 approached Associate 1 and informed him that Conspirator 1 was in a position through which he could direct Government contracts to businesses of his choosing.

25.     Conspirator 1 told this individual that all the individual needed to do was establish an LLC and "front" the money for the business, at which time Conspirator 1 would direct government contracts to this new LLC.

26.     In May 2014, Associate 1 sought the assistance of CLOMAN to start the business, as Associate 1 knew that CLOMAN had previously operated an LLC.

27.     On or about May 30, 2014, CLOMAN accompanied Associate 1 to meet with an attorney.  Associate 1 subsequently established L&K, with Associate 1 as the owner, and the Associate 1's home in Chesapeake, Virginia as L&K's business address.

28.     CLOMAN does not dispute that the Government would prove that on June 24, 2014, Associate 1 also established an L&K bank account at BB&T.

29.     CLOMAN was advised that he would be compensated for his assistance with L&K.

4

30.    Conspirator 1 generated four fraudulent purchase requests for L&K inert training aids between June and December 2014 of which CLOMAN was aware.

31.    For each purchase request, Conspirator 1 went through Firm V to purchase L&K's inert training aids via product substitution.

32.    CLOMAN does not dispute that the Government would prove that for each purchase request, Firm V built carts in E-Mall for various items unrelated to inert training aids.

33.    CLOMAN does not dispute that the Government would prove that once the USN released funds to Firm V for their E-Mall purchases, Firm V then subcontracted the training aid purchases to L&K.

34.    For each purchase request, Conspirator 1 created fraudulent sales quotes for the L&K items.

35.    CLOMAN would review these documents over an L&K Google e-mail account before their submission to Firm V.

36.    CLOMAN does not dispute that the Government would prove that once Firm V accepted a quote, Firm V would place the order for L&K's training aids, and L&K would produce an invoice for Firm V.

37.    CLOMAN does not dispute that the Government would prove that L&K would then generate a packing slip, which Conspirator 1 would sign to give the appearance that L&K had delivered the goods purportedly ordered.

38.    Conspirator 1 provided CLOMAN with pricing data and descriptions for the items purportedly ordered, as well as shipping information to create the false L&K invoices and packing slips.



39.     CLOMAN does not dispute that the Government would prove that the signed, fraudulent packing slips would trigger payment from Firm V to L&K.

40.     CLOMAN does not dispute that the Government would prove that on June 1, 2014, Conspirator 1 signed a purchase request form for supplies on behalf of his USN unit requesting 100 units of inert Symtex, 100 units of inert bulk C4, and inert C4 blocks.

41.     On or about June 18, 2014, CLOMAN and Associate 1 prepared a sales order for submission to Firm V representing a sale to Firm V of the items requested by Conspirator 1 in his purchase request.  The sales order listed a total price of $21,000.00.

42.     On June 18, 2014, CLOMAN and Associate 1 sent Conspirator 1 an email indicating that he had attached a sales order to the email as discussed over the phone. Conspirator 1 then sent this email to his contacts at Firm V.

43.     CLOMAN does not dispute that the Government would prove that by June 25, 2014, a Firm V purchase order was prepared representing that Firm V was purchasing the various items requested by Conspirator 1 from L&K on June 1, 2014.

44.     On July 1, 2014, an L&K invoice was prepared listing Firm V as the buyer.  The document listed Conspirator 1 and his unit as the entity to which L&K would deliver their goods. The invoice also listed a total price of $21,000.00.

45.     On the same date listed on the invoice, Conspirator 1 signed a packing list form representing delivery of the L&K items requested by Conspirator 1 on June 1.  The form listed "Dave Freese" as the L&K salesperson, and a delivery date of July 3, 2014.

46.     CLOMAN does not dispute that the Government would prove that on July 8, 2014, Conspirator 1 sent an email to his contacts at Firm V asking that they "wrap this one up as

completed." Conspirator 1 attached to the email the packing list slip signed by him on July 1, 2014.

47.     CLOMAN does not dispute that the Government would prove that on July 17, 2014, Associate 1 received a check from Firm V for $21,000.00, which Associate 1 then deposited into L&K's BB&T bank account.

48.     On July 9, 2014, CLOMAN sent Conspirator 1 an email containing a new sales order "via [their] previous conversation." Conspirator 1 forwarded this email, and the attached sales order to Firm V on the same day, requesting that his contacts at Firm V "get a cart going on this for me."

49.     The L&K sales order sent by CLOMAN listed six units of inert training kits worth $13,899.00 each, for a total sale worth $83,394.00.

50.     CLOMAN does not dispute that the Government would prove that Firm V incorporated this sales order into a purchase order, with a "schedule date" of July 9, 2014, naming Conspirator 1 in the "ship to" address, naming L&K as the vendor, and detailing the contents of the training kits.

51.     On July 16, 2014, CLOMAN sent an email to Conspirator 1 stating, "this email confirms that we have shipped your order." Conspirator 1 then sent an L&K invoice and signed packing slip to Firm V instructing them to "process to close out."

52.     On July 28, 2014, CLOMAN emailed an L&K invoice to Firm V associated with the June 18, 2014 sales request. The same day, a Firm V sales representative directed Firm V to "pay this vendor."

53. CLOMAN does not dispute that the Government would prove that on August 19, 2014, Associate 1 received a check from Firm V for $83,394.00, which he deposited into ~~Firm L's~~ BB&T checking account.

54. CLOMAN does not dispute that the Government would prove that on September 3, 2014, Conspirator 1 signed and generated a purchase request form for various inert training aids, totaling $80,794.96.

55. CLOMAN does not dispute that the Government would prove that on December 8, 2014, Conspirator 1 sent his contacts at Firm V an email containing an L&K sales order dated December 3, 2014. Conspirator 1 CC'd "Dave Freese" to the email.

56. CLOMAN does not dispute that the Government would prove that on December 9, 2014, Firm V requested that a quote be provided to them for a "quote that equals approx. $31,500." Firm V requested similar items as described in the December 3, 2014 sales order.

57. CLOMAN does not dispute that the Government would prove that on December 10, 2014, someone other than CLOMAN using the "Dave Freese" alias sent Firm V an email with a new sales order. He stated in the email "attached is the new quote for the products that [Conspirator 1] requested." The sales order quoted several units of inert training aids at a price of $30,300.00.

58. CLOMAN does not dispute that the Government would prove that on December 12, 2014, a Firm V sales representative sent L&K an email asking that he "send another quote for approx. $56,556.47 worth of items for [Conspirator 1]."

59. CLOMAN does not dispute that the Government would prove that L&K complied on December 15, 2014 by providing a new L&K sales order for several units of inert training aids, totaling $55,692.00.

60.    CLOMAN does not dispute that the Government would prove that on December 23, 2014, Conspirator 1 sent L&K an email indicating that he had returned packing slips, signed, to Firm V, indicating delivery of the purchased goods.

61.    CLOMAN does not dispute that the Government would prove that on January 7, 2015, a representative in Firm V's accounting department sent the Firm V sales representative an email stating that the order worth $30,300.00 had *not* been placed due to the fact that they had not been shown a proper L&K quote indicating costs per kit of inert training aids.

62.    CLOMAN does not dispute that the Government would prove that by January 9, 2015, amended documentation was provided to Firm V. At that time, a Firm V representative sent a purchase order to L&K for the goods purportedly *already* delivered by L&K to Conspirator 1 on or about December 23, 2014.

63.    CLOMAN does not dispute that the Government would prove that on January 22, 2015, Associate 1 received a check in an amount of $55,692.00 from Firm V, which he deposited into L&K's BB&T checking account.

64.    CLOMAN does not dispute that the Government would prove that on February 23, 2015, Associate 1 received a check in an amount of $30,300.00 from Firm V, which he deposited into L&K's BB&T checking account.

65.    Associate 1 provided CLOMAN with his cut of the L&K proceeds in cash payments.

66.    CLOMAN does not dispute that the Government would prove that L&K never provided the USN with any goods whatsoever.

67.     In total, the USN expended $280,992.94 for the aforementioned fraudulent dealings between Firm V and L&K, including mark-ups and fees for the USN's use of DLA and Firm V.

68.     Emails sent from CLOMAN, as "Dave Freese," and the L&K Gmail account were transmitted over the internet from the Eastern District of Virginia, and traveled through interstate commerce.

69.     As a result, and for his part in the L&K component of the conspiracy, CLOMAN personally obtained approximately $27,000.00 in proceeds.

### Wayne Tech Sales

70.     Firm F subcontracted business to Wayne Tech by virtue of a personal relationship between Conspirator 1 and an individual at Firm F (i.e., John Doe).

71.     On or about September 2015, Conspirator 1 advised CLOMAN that he could award Wayne Tech government contracts similar to how he awarded L&K such contracts.

72.     In September 2015, Conspirator 1 instructed CLOMAN to create a fraudulent Wayne Tech sales quote, invoice, and packing slip for various inert explosive training aids for the USN.

73.     CLOMAN filled out these documents as instructed by Conspirator 1, representing a sale of $90,195.50 in Wayne Tech products to the USN, using Firm F as an intermediary.

74.     On October 8, 2015, CLOMAN generated a Wayne Tech packing slip indicating delivery of the Wayne Tech training aids to the USN. CLOMAN e-mailed this document from Pensacola, Florida, to Conspirator 1 in Virginia Beach, Virginia.

75.     CLOMAN does not dispute that the Government would prove that on October 14, 2015, Conspirator 1 signed the packing slip, certifying delivery of the Wayne Tech products, when in fact they had not been.

76.     CLOMAN does not dispute that the Government would prove that Conspirator 1 submitted the signed packing slip to Firm F, triggering payment from Firm F to Wayne Tech.

77.     On December 10, 2015, CLOMAN received a wire-transfer of $90,195.50 into a Wayne Tech business checking account at Navy Federal Credit Union (NFCU) in Pensacola, Florida from Firm F's business checking account in Virginia.

78.     Conspirator 1 then instructed CLOMAN to retain $25,000.00 of the wire transfer proceeds to pay-off a debt owed to CLOMAN by Conspirator 1.

79.     On December 11, 2015, CLOMAN transferred $60,000.00 from the Wayne Tech business account, to his personal checking account.  CLOMAN then obtained two NFCU cashier's checks for $22,000.00 each and sent both to Conspirator 1 in Virginia Beach, Virginia via certified mail.

80.     Neither CLOMAN, nor anyone associated with Wayne Tech purchased any inert training aids or other military equipment for sale to the USN.

81.     Wayne Tech never delivered any product to the USN whatsoever.

82.     Conspirator 1, John Doe, and CLOMAN distributed the proceeds of the Wayne Tech business amongst Conspirator 1, John Doe, and CLOMAN.

83.     CLOMAN acknowledges that it was improper for government officials (e.g., himself and Conspirator 1) to personally profit from government contracts.

11

84. While CLOMAN was unsure as to L&K's capability to fulfill government contracts, he also had no reason to believe L&K itself maintained any separate warehouse or store of inventory.

85. CLOMAN knew Wayne Tech had no independent capability or infrastructure with which it could fulfill government contracts, but was led to believe that Conspirator 1 did have such capability.

86. Regardless of this knowledge, CLOMAN agreed with Conspirator 1, and others, to engage in the aforementioned dealings with the USN in order to personally profit.

The defendant acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses charged in this matter.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:

David A. Layne
Special Assistant United States Attorney

After consulting with my attorney, I hereby stipulate that the above statement of facts is true and accurate, and that had the matter gone to trial, the United States would have proved the same beyond a reasonable doubt.

COURTNEY DETRON CLOMAN
Defendant

12

I am the attorney for COURTNEY DETRON CLOMAN.  I have carefully reviewed the
above statement of facts with the defendant.  To my knowledge, the defendant's decision to
stipulate to these facts is an informed and voluntary one.

Jeffrey Swartz
Counsel for Defendant

13