# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Norfolk Division

**UNITED STATES OF AMERICA,**

v.                                          **CRIMINAL NO.: 2:18cr69**

**COURTNEY DETRON CLOMAN**

    **Defendant.**

## DEFENDANT'S POSITION
## WITH RESPECT TO SENTENCING FACTORS

Comes now the defendant, Courtney Cloman, by counsel, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, § 6A1.2 of the *Sentencing Guidelines and Policy Statements* and the Court's Sentencing Procedures Order, and hereby offers his position with respect to sentencing. Mr. Cloman respectfully states that he has reviewed the United States probation officer's presentence investigation report and has no objections to the report or to the calculation of the sentencing guidelines.

## STATUTORY AND GUIDELINE OVERVIEW

Mr. Cloman comes before the Court for sentencing on one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §371. He faces a maximum term of five years of imprisonment and up to three years of supervised release. The United States probation office has calculated an advisory guidelines sentencing range of 24 to 30 months. Mr. Cloman has cooperated with United States in its investigation of these events and has

been debriefed by federal agents over many hours on numerous occasions. Mr. Cloman anticipates that the government will file a motion for downward departure pursuant to §5K1.1 of the United States Sentencing Guidelines for his substantial assistance and will recommend a sentence reduction of 45% which would equate to a low end of 13 months. Mr. Cloman respectfully submits that there are significant factors which justify an additional variance to yield an appropriate sentence of probation.

## HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Courtney Cloman will be 35 years old on February 19, 2019. He is married with two children of his own with his wife Amanda, and two stepchildren from Amanda's previous marriage. Mr. Cloman's children are three years old and four years old. He is described as an "awesome dad" (PSR, ¶39) who "scares away the monsters in the middle of the night and kisses the scraped knees when they fall". (A. Cloman Ltr., Ex. 1-C).

As a son and as a brother, Mr. Cloman is devoted and generous, a symbol of pride and hard work to his family. Mr. Cloman's brother, Cameron, in a very heartfelt and moving letter to the court, described how Courtney saved his life when Cameron was contemplating suicide during a troubled time in his life. (C. Cloman Ltr., Ex. 1- B). Mr. Cloman has worked since he was 15 years old and enlisted in the Navy in 2002 after earning his GED. As an enlisted man, Mr. Cloman displayed "exceptional professionalism and impeccable dedication". (R. Glass Ltr., Ex.1-D). Mr. Cloman wanted more for himself and for his family. After rising to the rank of Petty Officer first

class (E-6), Mr. Cloman was accepted into Officer Candidate School as a naval flight officer and was commissioned in 2014. As noted in the presentence investigation report, one OCS interviewer, in considering Mr. Cloman's application, indicated that Mr. Cloman was one of the finest candidates he had interviewed in his 18 years of service. Another appraisal note stated that if only one candidate was selected, it should be Courtney Cloman. PSR ¶51. That would come as no surprise to the people who knew and worked with Courtney in the Navy. One former shipmate described him as reliable, thoughtful and dependable, the first person to introduce himself and show him the ropes. (M. Joyner Ltr., Ex. 1-F). Mr. Cloman's acceptance into OCS was a testament to his record and work ethic in the Navy. And once in flight training, Mr. Cloman's devotion to learning was "remarkable" and he became a mentor to other officers in his class. (Glass Ltr., Ex.1-D). Mr. Cloman has been a member of the United States Navy for 16 years and will now face a Board of Inquiry, discharge from the military and loss of income and retirement benefits, which may result in total aggregate losses of millions of dollars.

Mr. Cloman has furthered his education by earning a bachelor's degree in business administration in 2013 (PSR ¶48) and is currently enrolled in the executive MBA program at Strayer University. PSR ¶49.

## OFFENSE CONDUCT

In or around May 2014, Randolph Prince, referred to in the PSR as Conspirator 1, approached Associate 1 with a proposition that they set up a business to which Prince

could direct government contracts. PSR ¶8(25). Prince was a supply officer for a USN command and had authority to make purchase requests for his unit. PSR ¶8(5)(6). Associate 1 asked Mr. Cloman to assist him setting up the business. Mr. Cloman was advised that he would be compensated for his assistance with the business once it began. Prince used his contacts and relationships with a contracting firm to acquire subcontracts. PSR ¶8(31). Prince generated 4 purchase requests for the business, L&K, to fill. Mr. Cloman did not know that L&K held no inventory. PSR ¶8(8). Mr. Cloman was led to believe that Prince could fill these contracts. PSR ¶8(85). Prince created fraudulent sales quotes and provided the information to create the invoices and packing slips which he then signed in order to make it appear that L&K had delivered the goods. PSR ¶8 (34-38). The United States Navy spent $280,992.94 on fraudulent contracts with L&K. PSR ¶8(67). Mr. Cloman received approximately $27,000. PSR ¶8(69).

Prince later convinced Mr. Cloman to set up another business, Wayne Tech, which would also fill government contracts. Prince advised Mr. Cloman that he could award Wayne Tech government contracts similar to how he awarded such contracts to L&K. PSR ¶8(71). On December 10, 2015, Wayne Tech received payment of $90,195.50 on 1 contract. PSR ¶8(77). Prince instructed Mr. Cloman to retain $25,000 of those proceeds to pay off a debt owed by Prince. PSR ¶8(78). Most of that money was paid out to others as described in debriefings with government agents during the course of the defendant's cooperation. Mr. Cloman is attributed with a total loss amount of $387,107.45. PSR ¶11.

While this conduct was occurring, Prince was also conspiring with others in another similar scheme, unbeknownst to Mr. Cloman, which led to additional losses to the United States Navy of over $1.8 million dollars. (Prince ECF 7 - Statement of Facts ¶93). It was determined, in the prosecution of the case against Randolph Prince, Docket No. 2:18cr116, that in that separate fraudulent scheme which did not involve Mr. Cloman, Prince knowingly and willfully collected and failed to report income of $387,550.22. (Prince ECF 7, Statement of Facts ¶111).

## SENTENCING ARGUMENT

The Sentencing Guidelines are neither mandatory nor presumptively reasonable. The sentencing range that results from calculating a defendant's Criminal History Category and Offense Level is just one of the various factors the Court must weigh in choosing a sentence that is sufficient but not greater than necessary to accomplish the goals set forth in 18 U.S.C. § 3553(a)(2). While the Guidelines range may serve as a "starting point and the initial benchmark," a sentencing court must make an "individualized assessment based on the facts presented". *Gall v. United States*, 552 U.S. 38, 49-50 (2007). A sentencing court may find that "the Guidelines sentence itself fails [to] properly reflect § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007). But it is procedurally unreasonable (and reversible error) for a sentencing court to "presume that the appropriate sentence in a given case will come from the Guidelines." *United States v.*

*Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010) (citations omitted).

In this case, even a proper application of the Guidelines and the recommendation from the Government in its 5K motion, results in a sentence range that is far greater than necessary to accomplish the purposes of sentencing set forth by Congress. The Guideline range in this case is driven overwhelmingly by a single criterion - loss amount. A court may vary downward from the advisory range established by the Guidelines where application of the factors under § 2B1.1 "substantially overstates the seriousness of the offense". U.S.S.G. § 2B1.1 cmt. n. 20(C).

Courts have recognized this imbalance, branding the loss table under § 2B1.1 "a black stain on common sense". *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008). The loss table's enhancements "appear to be more the product of speculation, whim or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice". *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012); *see also United States v. Faibish*, No. 12-CR-265, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime.") The outsized role of the loss table is "[o]ne of the primary limitations of the Guidelines, particularly in white collar cases". *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wisc. 2005); *see also United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) (remanding for sentencing court to reconsider

Guidelines sentence "in view of the significant effect of the loss enhancement in relation to the low base offense level").

The offense level in Mr. Cloman's case yielded by the loss amount is grossly disproportionate relative to Mr. Cloman's conduct and the relatively small amount of financial gain he derived, particularly in light of the consequences which he will suffer from the probable loss of his military career and benefits. The Guidelines' singular focus on the loss amount obscures the defendant's "gain". Here, the amount of loss applicable to Mr. Cloman's offense conduct is far greater than any monetary benefit he received. The Department of Justice itself has recognized that where "personal gain to the defendant" is dwarfed by the loss amount, a below Guidelines sentence may be warranted. *See* Sentencing Commission Pub. Hr'g, Comments of Preet Bharara at 45-46 (Feb. 16, 2011); *see also* David Debold & Matthew Benjamin, *Losing Ground - In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. PA. L. REV. PENNUMBRA 141 (2011) ("As the DOJ has acknowledged, cases in which loss greatly exceeds a defendant's gain are likely candidates for below-guidelines variances.").

Where, as here, a single factor is the driving force behind a Guidelines range and that factor vastly overstates a defendant's culpability, a sentencing Court may find that "the Guidelines sentence itself fails [to] properly . . . reflect § 3553(a) considerations". *Rita,* 551 U.S. at 351.

This case exemplifies why the Supreme Court rejected mandatory and mechanical application of the Sentencing Guidelines and restored district courts' discretion "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue". *Pepper v. United States,* 131 S. Ct. 1229, 1239-1240 (2011) (internal quotations and citations omitted).

Under § 3553(a), the Court is required to impose a sentence that is "sufficient, but not greater than necessary," in light of various factors, including the following: (1) the history and characteristics of the defendant, (2) the nature and circumstances of the offense, (3) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (4) the need to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant, (5) the need to avoid unwarranted sentencing disparities among similar defendants with similar records who have been found guilty of similar conduct, and (6) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7).

Mr. Cloman appreciates that the Government has acknowledged his substantial assistance in filing its 5K Motion recommending a sentence reduction. However, there exists additional significant factors which do not necessarily impact the court's analysis of the downward departure motion but do justify an additional variance which is absolutely within the Court's discretion. The factors which a court is to consider in

determining an appropriate sentence reduction in the context of a motion under USSG §5K1.1 include: (1) the Court's evaluation of the significance and usefulness of the defendant's assistance, (2) The truthfulness, completeness and reliability of information provided by the defendant, (3) The nature and extent of the defendant's assistance, (4) Any injury suffered, or any danger or risk of injury to the defendant or his family, and (5) The timeliness of the defendant's assistance. *U. S. v. Hood*, 556 F. 3d 226 (4th Cir. 2009) cert denied, 558 U. S. 921 (2011).

Beyond those considerations and in analyzing the factors set forth in 18 U.S.C. 3553(a), this court should take collateral consequences into consideration as they serve as additional mitigating factors and can inform this Court's calculation of a proper retributive punishment. *See, e.g.*, *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (holding that the loss of a defendant's "teaching certificate and his state pension as a result of his conduct" are appropriate considerations "consistent with § 3553(a)'s directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence'") (citations omitted).

Mr. Cloman has worked tirelessly to support family, friends and co-workers and to pull himself up by his own bootstraps. A young man with a GED enlisted in the Navy. Sixteen (16) years later, he is a naval aviator with a bachelor's degree and working on earning his Master's degree. However, it is a distinct possibility that Mr. Cloman will be separated from the Navy as a result of this conviction. Having not

reached the 20 year mark, he will lose not only income but also significant retirement benefits which will impact his family as well. Having just embarked on this new path as a pilot, it was Mr. Cloman's goal to make the Navy his career and to stay in at least 30 years. A JAG Corps attorney has offered his assesment that if Mr. Cloman is not incarcerated, he will have a better chance of saving his career. Attached to that letter are summary charts which reflect the lost retirement income which Mr. Cloman may suffer. As the Court will see, if Mr. Cloman retired after 30 years of service, he would be less than 50 years old. Depending, of course, how long he lives after retirement, his family stands to lose millions of dollars which would have been earned through Mr. Cloman's continued service. *See* S. Danehay Ltr. and Attachment, Ex. 2.

Respectfully, the consequences of this conviction on Mr. Cloman and his family will be severe regardless of the actual punishment meted out by this Court. His military career, if ended, will irreversibly alter his ability to provide for his family. *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (holding that the sentencing court properly considered under 18 U.S.C. § 3553(a)(2)(A) that the "conviction itself already visit[ed] substantial punishment" on the defendant by likely barring him from future work in his chosen profession).

## **PROTECTING THE PUBLIC AND GENERAL DETERRENCE**

The sentence imposed by the Court must accord due deference to the goals of protecting the community by deterring future criminal conduct, both by Mr. Cloman

and others. Here, a sentence of incarceration is not necessary to deter Mr. Cloman from re-offending and to send an appropriate message of deterrence to those similarly situated.

In this case, Mr. Cloman presents an objectively low risk to re-offend based on almost every possible applicable factor, including his age, good mental health, lack of history of substance abuse, positive family relationships and stable housing. First time offenders like Mr. Cloman are statistically less likely to re-offend. Studies by the U. S. Sentencing Commission have found that college graduates have the lowest recidivism rate of any offense category studied, and those convicted of fraud have the lowest recidivism rate of any offense category studies. [*See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28-29 (May 2004). The Commission's 2016 study found similar trends. *See* U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview, Appendix A-2* and at page 5 (Mar. 2016)].

A sentence of probation is sufficient to achieve general and specific deterrence. Research indicates that increases in the *severity* of punishment are far less important to producing deterrent effects than the *certainty* of punishment. *See* Wright, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment. Indeed, virtually no empirical data suggests that harsher (more lengthy) sentences achieve better general deterrence than moderate sentences; Michael Tonry, Purposes and Functions of

Sentencing, 34 CRIME & JUST. 1, 28-29 (2006) [noting that three National Academy of Science panels and "every major survey of the evidence" has reached the conclusion that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects"]. Mr. Cloman will be a convicted felon, his reputation ruined and his family devasted. However, he has fully accepted responsibility for his conduct and has made every effort to demonstrate that and to set himself back on the right path through his cooperation and his plea.

## CONCLUSION

For the forgoing reasons, Courtney Cloman respectfully requests that the Court impose a term of probation with appropriate conditions which would yield a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Respectfully submitted,

**COURTNEY DETRON CLOMAN**


By: _____/s/_____

Jeffrey A. Swartz, Esquire
Virginia State Bar ID No. 28143
Franklin A. Swartz, Esquire
Virginia State Bar ID No. 04352
Attorney for Defendant, Courtney Detron Cloman
Swartz, Taliaferro, Swartz & Goodove
220 West Freemason Street
Norfolk, Virginia 23510
(757) 275-5000 Telephone
(757) 626-1003 Facsimile
Email: JSwartz@stsg-law.com

## CERTIFICATE OF SERVICE

I certify that on the 31st day of January, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to:

David A. Layne, Esquire
Special Assistant United States Attorney
Office of the United States Attorney
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-3555
Facsimile Number: 757-441-3205
David.Layne@usdoj.gov

_____/s/_____
Jeffrey A. Swartz, Esquire
Virginia State Bar ID No. 28143
Franklin A. Swartz, Esquire
Virginia State Bar ID No. 04352
For Defendant, Courtney Detron Cloman
Swartz, Taliaferro, Swartz & Goodove
220 West Freemason Street
Norfolk, Virginia 23510
(757) 275-5000 Telephone
(757) 626-1003 Facsimile
Email: JSwartz@stsg-law.com